812 So.2d 795 (2002)
John Glynn LINCECUM
v.
Shelly Marie LINCECUM.
No. 01-1522.
Court of Appeal of Louisiana, Third Circuit.
March 6, 2002.
*796 Brian D. Cespiva, Gravel, Cespiva, & Wilkerson, Alexandria, LA, for Plaintiff/Appellant John Glynn Lincecum.
Michael Hathorn Davis, Davis & Saybe, Alexandria, LA, for Defendant/Appellee Shelly Marie Lincecum.
Court composed of SYLVIA R. COOKS, MARC T. AMY, and GLENN B. GREMILLION, Judges.
GLENN B. GREMILLION, Judge.
In this case, the plaintiff, John Glynn Lincecum, appeals the judgment of the trial court maintaining the custody arrangement stipulated to by he and the defendant, Shelly Marie Lincecum. For the following reasons, we affirm as amended.

FACTUAL AND PROCEDURAL BACKGROUND
John and Shelly were married in June 1992. Of this marriage, Julie Marie Lincecum was born in September 1992. John filed for divorce from Shelly in May 1996. In that petition, John set forth a joint custody arrangement agreed to by himself and Shelly, which did not name either as the domiciliary parent of Julie. A judgment of divorce was granted in June 1996, implementing the custody agreement stipulated to by the parties.[1] Thereafter, in January 2001, John filed a rule to show cause for custody urging that circumstances had changed since the first agreement, *797 specifically, that Shelly had failed to maintain a stable, happy, and healthy home environment for the child. John requested that the joint custody arrangement continue, but that he be named domiciliary parent.
Shelly answered, and as plaintiff in rule, also claimed that the previous joint custody arrangement needed to be modified to name her as the primary domiciliary parent. Shelly claimed that the change in circumstances included: Julie's advancing age, her need to be in one household for longer periods of time, and her preference to be with her mother; Shelly's more accommodating work schedule and her ability to provide more "hand's on" parenting than John, who must leave Julie's care to others; and, the addition of another child in John's household which defers attention away from Julie, who is the only child in Shelly's household. Shelly further requested an increase in child support.
After a hearing on the matter in March 2001, the trial court rendered a judgment maintaining the original joint custody agreement of the parents. It further did not name either party domiciliary parent and did not increase the child support payment to Shelly. This appeal by John followed.

ISSUES
John claims the trial court abused its discretion in failing to designate him as the domiciliary parent and in failing to implement a new plan of joint custody, which would contemplate Julie being in his home particularly during school weeks.

LAW AND DISCUSSION
A trial court's determination of child custody is entitled to great weight on appeal and will not be disturbed absent a clear abuse of discretion. AEB v. JBE, 99-2668 (La.11/30/99), 752 So.2d 756. When the trial court has made a considered decree of permanent custody, the petitioning party bears the difficult burden of proving that the continuation of the present custody situation is so deleterious to the child that it justifies a modification of the custody arrangement, or of proving by clear and convincing evidence that any harm likely to be caused by the change of environment is substantially outweighed by the advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). A considered decree is one in which evidence as to parental fitness has been received by the trial court. Oliver v. Oliver, 95-1026 (La.App. 3 Cir. 3/27/96), 671 So.2d 1081.
When a considered decree has not been rendered, but the parties have stipulated to an agreement without the court considering parental fitness, a lesser burden applies. In order to modify a custody arrangement, the movant must prove that 1) a material change in circumstances has occurred, and 2) that the new custody arrangement would be in the best interest of the child. Id.
In this case, the original custody arrangement was by stipulation of the parties and is, therefore, not a considered decree. Thus, the latter burden of proof applies.
John argues that La.R.S. 9:335(B)(1) required that the trial court name a domiciliary parent. We disagree. La.R.S. 9:335(B)(1) states: "In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown." However, an examination of La.Civ.Code arts. 131 and 132 leads us to believe that, when parents have agreed on a custody arrangement that the trial court finds is in the best interest of the child, it need not designate a domiciliary parent. La.Civ.Code *798 art. 131 states: "In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child." La.Civ.Code art. 132 (emphasis added) states:
If the parents agree who is to have custody, the court shall award custody in accordance with their agreement unless the best interest of the child requires a different award.
In the absence of agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent.
Comment (c) to Article 132 states: "The second sentence of this Article governs the decision whether to award joint custody. The legal effects of joint custody, once it is awarded, are addressed in R.S. 9:335 (1993)."
Therefore, the trial court is obligated to adhere to the requirements of La.R.S. 9:335(B)(1) only if it finds that a change of circumstance occurred and the best interest of the child requires it to formulate and award joint custody. In this case, John and Shelly agreed not to establish a domiciliary parent, but to essentially be co-domiciliary parents. Thus, if the trial court finds that the agreement between the parties is in the best interest of the child, it shall award custody in accordance with the agreement.
The evidence at trial showed that John and Shelly confected the original custody agreement in which Shelly had Julie for four days and he had her for three days of every week, alternating week days so that each parent would have her for the weekend. John testified that the original agreement was orally modified sometime in 1996 to provide him with four more days of custody per month to make the split of time even. He also agreed to pay Shelly $25 more per month in child support (for a total of $175 per month). He said this arrangement had been in effect up until the time of trial.
John argued that he should be named the domiciliary parent because he could provide a more stable home environment. He testified that he has been married to his current wife, Patricia (Trisha), for four years and that they have a two-year-old son, Thomas. John stated that Julie is a healthy third-grader and that he and his wife assist her with her homework, attend parent-teacher conferences, and take her to church on the Sundays that they have her. John went on to testify that he has been the head coach of Julie's softball team for four years and the assistant coach for one year. He stated that he has been employed by Gunn Electric Company for the past seven years and works from 7:00 a.m. to 3:30 p.m. every day, and that he may have to work late once a month. He testified that Trisha is a teacher's aide for the Rapides Parish School Board and that she works from 8:00 a.m. to 2:45 p.m. daily. He said that when he has Julie, Trisha takes her to and picks her up from school. He also stated that he lives in a three bedroom brick home on three acres of land in Ball, Louisiana.
According to John, the problems began in November 2000, when Julie started complaining of her mother and step-father fighting. He stated that Shelly told him around that time that she would be leaving her husband and moving back in with her parents. He claimed that Shelly moved in with a friend for a short while and that she moved again to her current address. John went on to state that Julie's grades began to decline around this time from almost straight "A's" to "C's," "D's," and "F's." Graded schoolwork completed from November *799 2000 to February 2001 was introduced into evidence and showed that Julie had received one "C," two "D's," and four "F's." However, John did state that Julie was able to bring her grades up and still make the "A-B" honor roll. He also testified that she began having behavioral problems, although declining conduct was not evidenced on her report card.
Opal Hudson, former mayor of Ball, testified that she has known John all of his life and Trisha since 1987. She stated that she sees John, Trisha, and Julie every Sunday at church. She stated that the Lincecums are good people and that John appears to be a good father.
Roy Hebron, current mayor of Ball, testified that he has known John all his life and that the Lincecums are well respected in the town. He stated that he has met Trisha several times. Hebron testified that he sees John and Julie interact almost daily because he coaches T-ball at the same ball park where John coaches Julie's softball team. He stated that John is an attentive and good father. He also testified that he has no idea what kind of interaction Shelly has with Julie.
Donald Bennett testified that he has known both Shelly and John for four years. He testified that he leaves to go to work for the post office at 3:30 a.m. and has seen the vehicle owned by Shelly's boyfriend, Chad Duggar, at her residence on at least five or six occasions when Julie was there. He stated that he knew Julie was there because he coaches with John and speaks to him every day or so and he is aware of the custody arrangement. He further stated that he drove by Shelly's residence as a favor to John to see who may be staying over when Julie was present. However, he went on to state that he has not actually seen Julie or Duggar on these occasions. He also stated that, after the papers had been served, Duggar's car was not present at Shelly's residence.
Carla Parker, Rapides Parish Sheriff's Deputy, testified that she is a custodian of the criminal records. She stated that she had records of two different incidents recently occurring in the Hagan trailer park where Shelly lives. The incidents included aggravated second degree battery, aggravated battery, and armed robbery.
Glenda Lincecum, John's mother, testified that Julie was upset because her mother let her read the pleadings filed by her father. She stated that Julie said she did not want to have to choose between her mother and father. She also stated that she takes Julie to school every morning when her father has her.
Trisha testified that Julie and Thomas have a very close relationship. She stated that she, John, and Shelly have an amicable relationship and have worked well together in carrying out the custody arrangement.
On the other hand, Shelly testified that she has worked at Aegon Risk Services, an insurance company, for six years. She stated that she works Monday thru Friday from 8:30 a.m. to 5:00 p.m. and can leave work when necessary to attend to Julie's needs. She further stated that she had recently left her second husband and was currently dating his first cousin. She testified that Duggar does sleep over some nights, but only when she does not have Julie.
Shelly went on to state that she is not fearful of the neighborhood she lives in and that it has been very quiet in her part of the park. She stated that she and John lived in the very same trailer park when they were first married. She further testified that she brings Julie to school on the mornings she has her, and that she attends all of Julie's school activities and her softball *800 and basketball games. Shelly testified that she takes her to church on Sundays. She further testified that she believed the relationship between herself, John, and Trisha had been very positive and had worked out well for the past four years.
Duggar testified that he has never spent the night at Shelly's house while Julie was present. He stated that Julie was indeed still married to his first cousin, but that they did not begin dating until a month and a half after she left him.
Nancy Pratt, Shelly's work supervisor, testified that Shelly has flexibility to leave work for any reason to attend to her child's needs. She stated that Shelly is dependable, conscientious, and very thorough in her job.
Joyce Prestridge, Shelly's sister-in-law, stated that Shelly's home is very clean and that she is not fearful of going there on the weekends with her young child. We further examined photographs of the mother's residence, which indicated that Julie has her own room and that the trailer is very neat and well kept.
It is undisputed that all of these parties get along well and have managed this arrangement for four years without incident. Both parents split custody of the child evenly. Only recently, when Shelly was encountering an adjustment period in her life due to divorce from her second husband, have any problems arisen. We do not feel this temporary situation, which appears to have been resolved at the time of trial, is sufficient to warrant a change in the custody plan that has, by all of the parties' accounts, worked very well over the years. In its reasons for judgment, the trial court stated:
After a careful review of all relevant factors, this Court finds that the best interest of the child is served by a continuation of the parties mutual custody agreement. Although both parties have made changes in their lives subsequent to the original custody agreement, this Court finds that these changes do not warrant a change in custody. Both parents love the minor child immensely. Both parties are readily involved in the child's education and guidance. Both parties are found to be morally fit, able to provide continuing care and attention, and actively involved in the child's rearing. Additionally, this Court finds that no change in circumstance has occurred that would warrant an increase in the present child support obligation.
Accordingly, this Court orders that the original joint custody plan obligation, agreed upon by the parties and rendered by this Court on June 4, 1996, is to continue unchanged, without either party being granted domiciliary status. The child support obligation contained within the June 4, 1996 judgment will also remain unchanged.
We agree with the trial court that the mutually agreed upon custody arrangement should continue in effect. We further hold that the trial court did not abuse its vast discretion in finding that no material change in circumstances has occurred and that it is in Julie's best interest to continue the custody arrangement. However, we affirm the orally modified agreement, which split time equally between the parents and increased John's child support payment from $150 to $175, rather than the original custody agreement set forth in the June 4, 1996 judgment of divorce.[2]

*801 CONCLUSION
The judgment of the trial court is affirmed as amended. All costs of this appeal are assessed against the plaintiff-appellant, John Glynn Lincecum.
AFFIRMED AS AMENDED.
NOTES
[1] The portion of the judgment of divorce pertaining to custody of Julie states:

It is further ORDERED, ADJUDGED, AND DECREED that JOHN GLYNN LINCECUM and SHELLY MARIE LINCECUM are awarded joint custody of the minor child born of the marriage, namely Julie Marie Lincecum, with the following joint custody plan to be exercised between the parties:
A. Julie Marie Lincecum shall reside with Shelly Marie Lincecum three days during the work week and with John Glynn Lincecum two days during the work week, said days to be agreed upon between the parties.
B. Shelly Marie Lincecum and John Glynn Lincecum agree to alternate visitation every other weekend beginning on Friday and ending on Sunday with times to be mutually agreed upon between the parties.
C. Holidays will be mutually agreed upon between the parties with equal time granted to both parents. Shelly Marie Lincecum shall have Julie Marie Lincecum on Christmas Eve and John Glynn Lincecum shall have Julie Marie Lincecum on Christmas Day.
D. John Glynn Lincecum shall pay the sum of $150.00 per month as child support to Shelly Marie Lincecum for the maintenance and support of Julie Marie Lincecum.
E. Shelly Marie Lincecum agrees to maintain medical insurance coverage on Julie Marie Lincecum through her place of employment.
F. John Glynn Lincecum agrees to pay any out-of-pocket medical expenses not covered by the medical insurance incurred on behalf of Julie Marie Lincecum.
G. The parties agree to alternate claiming Julie Marie Lincecum on their federal and state income tax each year, whereas John Glynn Lincecum shall claim Julie Marie Lincecum in all even-numbered years beginning in 1996 and Shelly Marie Lincecum shall claim Julie Marie Lincecum in all odd-numbered years beginning in 1997. Each party agrees to execute any and all forms required by the taxing authority allowing the claim for deduction.
[2] Shelly's brief states that the increase had been from $150 to $225 per month. She testified as to an increase, but never stated the actual amount. John and Trisha both testified that the increase had been to $175 per month and no contrary evidence was presented, thus, we adopt this figure.